# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 21-25V**

|  |  |
|---|---|
| ROSALIND CUMMINGS, | Chief Special Master Corcoran |
| Petitioner, | Filed: April 30, 2025 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*David John Carney, Green & Schafle LLC, Philadelphia, PA, for Petitioner.*

*Nina Ren, U.S. Department of Justice, Washington, DC, for Respondent.*

### FINDINGS OF FACT  AND CONCLUSIONS OF LAW DISMISSING TABLE CASE[1]

On January 4, 2021, Rosalind Cummings filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a Table injury—a shoulder injury related to vaccine administration ("SIRVA")—as a result of an influenza ("flu") vaccine she received on October 18, 2018. Petitioner's Motion for Ruling on the Record, dated June 23, 2023 (ECF No. 35) ("Mot.") at 1–2. She also contends in the alternative that a second vaccination (administered slightly over a year later—on November 18, 2019) exacerbated

---

[1] Because this ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet**. In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

the SIRVA attributable to the 2018 vaccination. *Id.* The case was assigned to the Special Processing Unit of the Office of Special Masters (the ("SPU").

For the reasons set forth below, I conclude that Petitioner has not established by preponderant evidence that the onset of any SIRVA attributable to the 2018 vaccination occurred in the 48-hour timeframe required for this Table claim. Petitioner does, however, have a potentially tenable non-Table claim for significant aggravation based on the second, 2019 vaccination.

## I.    Relevant Procedural History

Approximately fourteen months after the claim's activation, Respondent filed a Rule 4(c) Report challenging compensation. Respondent's Report, dated Mar. 13, 2023 (ECF No. 33). Respondent argues that Petitioner has failed to establish that she suffered shoulder pain within 48 hours of the 2018 vaccination. *Id.* at 7–8. Respondent thus asserts that Petitioner cannot meet one of the four QAI requirements for a Table SIRVA, and the case must be dismissed. *Id.*; 12 C.F.R. § 100.3(c)(10)(ii).

Thereafter, on June 26, 2023, Petitioner filed a Motion for Ruling on the Record, arguing that Petitioner is entitled to compensation for injuries related to the October 2018 and/or November 2019 flu vaccinations. *See generally* Motion, dated June 26, 2023 (ECF No. 35). Respondent filed his response on August 9, 2023, maintaining that Petitioner had failed to meet her burden of proof for a Table claim. Response, dated Aug. 9, 2023 (ECF No. 36). Petitioner filed a reply requesting a ruling in Petitioner's favor, and/or allow Petitioner to "obtain and file an expert report on causation". Reply, dated Aug. 23, 2023 (ECF No. 37). This matter is now ripe for adjudication.

## II.    Facts

### A.  Medical Records

- Petitioner received a flu vaccine in her left arm on October 18, 2018. Ex. 11 at 2.

- Almost one year later—on September 17, 2019—Petitioner went to her primary care physician ("PCP"), Dr. Albert Fink, Jr., and the record from this visit contains the first complaints of left shoulder pain. Ex. 4 at 21–29. In particular, Petitioner informed Dr. Fink that she had felt left arm pain and occasional weakness "for about [one] year," although the document does

not specify a precise onset date (and does not otherwise link the pain to the October 2018 vaccination). *Id*. at 21.

- The physical exam performed by Dr. Fink at this time indicated impingement, but noted that Petitioner displayed "[g]ood ROM." Ex. 4 at 28. Dr. Fink diagnosed Ms. Cummings with left shoulder tendonitis, recommended that she receive a flu vaccine "this fall," and referred her to physical therapy (PT) (although there is no record evidence she began PT any time in 2019). *Id.* at 23–24, 26, 28.

- Petitioner had an x-ray performed on September 23, 2019. Ex. 6 at 51. The x-rays showed "mild enthesopathy at the greater tubercle" and that the soft tissue was "unremarkable". *Id.*

- Petitioner received a second flu vaccine on November 19, 2019, also in her left arm. Exhibit 11 at 3.

- On December 10, 2019, Petitioner had an unrelated appointment for foot pain. There was no mention of shoulder pain at this visit. Ex. 9 at 6–7.

- On December 30, 2019, Petitioner went to the emergency room at Main Line Health for treatment of acute left shoulder pain. *See generally* Ex. 8. The record from this visit notes that Petitioner had "pain in left shoulder for 1 ½ months" and it's "constant and worse with movement". *Id.* at 9. Emergency room doctors found Petitioner had full range of motion with pain. *Id* at 11. X-rays were clear. Petitioner was provided lidocaine patches and told to follow up with her PCP. *Id.* at 12.

- On February 3, 2020, Petitioner saw orthopedist Dr. John Luksch, D.O., reporting deltoid pain since November 2018 (after the October vaccination) that had not resolved. Ex. 2 at 7. She also noted that she had felt increased pain since the more recent November 2019 vaccination. Dr. Luksch noted Petitioner had "full cervical motion" and that the "contralateral shoulder has full motion and strength." *Id.* at 8.

- On February 6, 2020, Petitioner had an MRI of the left shoulder. Ex. 2 at 7–15. Imaging results revealed tendinosis of the rotator cuff and subacromial subdeltoid bursitis. *Id.*

3

- On February 13, 2020, Petitioner returned to Dr. Luksch for follow-up treatment of her continuing shoulder pain. Ex. 2 at 3–5. Dr. Luksch found that Petitioner had "near – full range of motion in active and forward flexion and abduction, plus "full cervical motion," and that her shoulder had "full motion and strength." *Id.* at 3, 4, 8. Dr. Luksch discussed non-surgical remedies with Petitioner, including a short course of anti-inflammatories or a steroid injection. *Id.* at 4–5.

- Petitioner had 10 physical therapy sessions with Chris Donohue, PT, between March 5, 2020, and May 5, 2020. Ex. 8 at 8–17.

- On June 30, 2020, Petitioner received a third dose of the flu vaccine, again in her allegedly-affected left arm. Ex. 11 at 3.

- On July 28, 2020, Petitioner saw Dr. Charles Getz at Rothman Orthopaedics for her left shoulder pain. Ex. 3 at 4. She stated that her complaints had begun after the November 2019 vaccination, and reported pain radiating down the front of her shoulder. *Id.* Dr. Getz review previous MRI and x-ray results and found upon physical examination that Petitioner showed "impingement signs" and had "much more pain with biceps provocative maneuvers". *Id.* at 5. Dr. Getz gave Petitioner in injection in the left joint, which was tolerated well. *Id.* Petitioner was to follow up in a week for further recommendations.

- Petitioner did not seek treatment again for any related issues until March 2021, when she had a follow up appointment with Dr. Getz. Ex. 14 at 10. Dr. Getz found "no mass atrophy," and she displayed no pain with range of motion. Petitioner was given a repeat lidocaine injection at this visit. *Id.* at 10. Petitioner obtained additional treatment at Rothman Orthopaedics in May 2021, and was prescribed Medrol. *Id.* at 8.

- On July 20, 2021, Petitioner returned to Dr. Getz for additional treatment of continuing shoulder pain. Ex. 14 at 4–5. Upon examination, Petitioner displayed pain with a forced external rotation. Petitioner was noted to have had improvement with the previous lidocaine injection, and she received another injection at this visit. *Id.*

- On September 28, 2021, Petitioner again saw Dr. Getz. Ex. 17 at 4–5. Dr. Getz ordered a new MRI and prescribed a Medrol Dosepak to help with Petitioner's shoulder inflammation. *Id.* Dr. Getz noted the temporal relationship between her complaints and the 2019 vaccination, although he

deemed treatment options to be limited, and expressly discounted the possibility of surgery as a beneficial intervention. Ex. 15 at 5.

- On October 1, 2021, Petitioner had a second MRI on her left shoulder. Ex. 12 at 72–83. Results revealed "small excess fluid in the bursa," and a "partial interstitial tear" in the anterior infraspinatus. *Id.* at 73. It was also noted that there was "no full-thickness rotator cuff tear". *Id.* at 74.

- Almost six months later, Petitioner returned to Dr. Getz on March 7, 2022. Ex. 17 at 7. On physical exam, Petitioner was noted to have "near full range of motion" and good strength. *Id.* at 7. Dr. Getz also noted that it appeared that there might be "damage to the rotator cuff," and discussed surgical repair options. *Id.* at 8.

## B. Other Evidence

Petitioner submitted a declaration in support of her claim. Declaration, dated December 4, 2020, filed as Ex. 1 (ECF No. 6-1). In it, she maintains that after receipt of the flu vaccine in October 2018, she "felt a sharp and intense pain in my left that persisted for several months." Declaration at 2 ¶9. She did not, however, seek immediate treatment because she was "not one to immediately go to the doctor with every kind of ailment I have and being in healthcare, I had some knowledge that I could treat my shoulder with ice, heat and NSAID medications." *Id.* at 3 ¶10. But after her September 2019 treatment, her condition improved—enough to make her able to obtain a second vaccination in November 2019. *Id.* at 3 ¶11.

Petitioner further alleges that she continues to experience "severe pain, discomfort, and decreased range of motion in [her] left shoulder affecting [her] daily life, hobbies, and work responsibilities" due to exacerbation of her 2018 vaccine-related injury. Declaration at 2 ¶7. The shoulder pain has affected her ability to sleep, raise her arm and carry objects. *Id.* Petitioner affirms that the pain has made her suffer "physically and emotionally" and continues to cause her "tremendous difficulties" with her employment as an IV technician.

## III.    Issue

At issue is whether Petitioner's onset (specifically pain) after the October 2018 vaccination occurred within 48 hours, as set forth in the Vaccine Injury Table and Qualifications and Aids to Interpretation ("QAI") for a Table SIRVA. 42 C.F.R. §

100.3(a)(XIV)(B) (influenza vaccination); 42 C.F.R. § 100.3(c)(10)(ii) (required onset for pain listed in the QAI).

## IV.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y*

6

*of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

---

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. Section 11(c)(1)(A)(B)(D)(E).

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

### ANALYSIS

Although Petitioner's claim involves two separate vaccination events, her overall injury is alleged to have started with a SIRVA attributable to an October 2018 vaccination. But no Table claim can succeed based on that vaccination, because Petitioner has failed to establish onset of 48 hours, as required by the Table.

The evidence in the record clearly establishes that Petitioner did not seek treatment for nearly a *year* after her 2018 vaccination. And when she did first complain of shoulder pain in September 2019, she was somewhat vague as to onset (stating her sensations of pain and weakness had been present for a year—which could arguably

8

mean they predated the October 2018 vaccination). Ex. 4 at 21. Nor did she identify the vaccination as the start of this pain (something that might allay some of the issues raised when a claimant waits so long post-vaccination to seek treatment). And there is otherwise no contemporaneous, objective record proof pinpointing onset within the required, two-day period.

Too much time passing from the 2018 vaccination to a first treatment event, with zero evidence to be found in the lengthy gap, prevents a finding of likely two-day onset. And the only other evidentiary items Petitioner cites to in support of onset deserve little weight. *See* Mot. at 17–18. Her declaration, for example, was prepared two years after her purported onset (not to mention to support this claim's filing), and it has no record corroboration. Otherwise, Petitioner refers to a February 2020 visit to Dr. Luksch (Ex. 2 at 7)—and not only is the proof of onset in this record reflective of Petitioner's personal recitation of her history, but it identifies onset from **November 2018**—and hence more than two days post-vaccination. Although the standard applied to SIRVA claims on the onset issue is fairly liberal, not every SIRVA claim can be so preponderantly established—and clearly in this case that standard is unmet.

At the same time, however, the record *does* establish that Petitioner had concerns about a shoulder-related injury before her November 2019 vaccination. She sought treatment for shoulder issues in the wake of that vaccination within two months of it. And she thereafter consistently maintained that the second vaccination event had worsened her preexisting issues.

All of this evidence is sufficient grounds for a significant aggravation claim, based on the contention that some kind of shoulder-associated pain prior to the November 2019 vaccination was worsened thereafter due to that vaccine administration. Petitioner should, therefore, be permitted the opportunity to pursue such a claim, although she clearly will require expert input on this front. To that end, the matter will be transferred out of SPU so that she can attempt to better substantiate such a non-Table claim.

## Conclusion

For the reasons set forth above, Petitioner's Table claim based on the October 2018 vaccination is hereby DISMISSED. The Petition will be transferred out of SPU to provide Petitioner the opportunity to litigate a significant aggravation claim based on the November 2019 vaccination.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

9